USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2287 ROBERT B. REICH, ETC., Plaintiff, Appellee, v. CAMBRIDGEPORT AIR SYSTEMS, INC., Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Bailey Aldrich,* Senior U.S. Circuit Judge] _________________________ ____________________ Before Breyer,** Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Barry C. Klickstein with whom Herbert Abrams, Sandra J. ______________________ _______________ ___________ McLaughlin and Abrams, Roberts, Klickstein & Levy were on brief for __________ ___________________________________ appellant. Edward D. Sieger, Senior Appellate Attorney, Thomas S. ____________________ __________ Williamson, Jr., Solicitor of Labor, Allen H. Feldman, Associate ________________ _________________ Solicitor for Special Appellate and Supreme Court Litigation, and Nathaniel I. Spiller, Counsel for Appellate Litigation, United States ____________________ Department of Labor, were on brief for appellee. ____________________ June 20, 1994 ____________________ *Of the First Circuit, sitting by designation. **Chief Judge Stephen Breyer heard oral argument in this matter, but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). ____________________ CAMPBELL, Senior Circuit Judge. The Secretary of _____________________ Labor ("the Secretary") brought this retaliatory discharge action in the United States District Court for the District of Massachusetts pursuant to Section 11(c) of the Occupational Safety and Health Act of 1970 ("the OSH Act"), 29 U.S.C. 660(c). The Secretary's complaint alleged that defendant-appellant Cambridgeport Air Systems ("Cambridgeport") violated the OSH Act in June 1989 by discharging two employees, Peter Richardson and Shawn Roche, because they had complained about health and safety problems at Cambridgeport's Salisbury, Massachusetts plant. Richardson had been employed by the defendant as a welder; Roche was a general shipper-trainee. The claim was tried by the court over five days in May 1993. In a written opinion, the district court found that the defendant-appellant had discharged Richardson because of his protected activities. The court awarded Richardson back pay and then doubled this award, as the Secretary had requested, to "cover additional damage plus prejudgment interest." The total amount awarded to Richardson was $104,968. The court found that Roche was not discharged for his own protected activity. Rather, the court found that he was terminated because "he was a special friend of Richardson's," that his discharge was "a house-cleaning -3- proposition," and that he "would not have been discharged but for his connection with Richardson." As with Richardson's award, the court awarded Roche an amount equal to twice his lost back pay, a total of $88,552. Cambridgeport appeals, and we affirm. I. Cambridgeport does not appeal from the district court's ruling that Richardson was terminated because of his protected activities. Rather, Cambridgeport argues that the district court erred in finding that Roche's termination was retaliatory, and in calculating the back pay damages for both Richardson and Roche. As both determinations depend on findings of fact, we may set them aside only if "clearly erroneous." Fed. R. Civ. P. 52. We are required to give "due regard" to the "opportunity of the trial court to judge the credibility of the witnesses." Id. Under this ___ deferential standard, we must accept a district court's account of the evidence if it is "plausible in light of the record viewed in its entirety . . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. ________ Bessemer City, 470 U.S. 564, 574 (1985). _____________ A. -4- Cambridgeport contends that Roche was terminated for valid work reasons, not in retaliation for his association with Richardson. Roche admitted at trial that he had made mistakes at work and had been reprimanded. Roche's supervisors also testified that his work performance was poor. Cambridgeport contends that the only evidence in support of the court's explanation for Roche's discharge came from Roche himself, whose testimony was not deemed credible in other respects by the district court.1 It is true that the district court was unwilling to credit Roche's testimony that he had joined Richardson in complaining about safety and health matters. Still, there was sufficient evidence to support the court's finding that Roche was terminated because of his connection with Richardson. There was evidence that Roche and Richardson were particularly close friends and that management was aware of this. Roche's supervisor had warned Roche not to raise safety concerns. In addition, Roche's termination followed less than a week after Richardson's, at a time when Roche, according to his testimony, was sufficiently concerned about his job security to bring a tape recorder to work. Moreover, the court was unimpressed by Cambridgeport's asserted reasons for Roche's discharge. Cambridgeport's witnesses, it said, ____________________ 1. Cambridgeport concedes that the OSH Act would prohibit Roche's termination if in fact he was discharged because of his relationship with Richardson. -5- had "greatly exaggerated" their accounts of Roche's problems at work. Given its adverse assessment of the credibility of Cambridgeport's witnesses, and the close and visible connection between Richardson and Roche, the district court felt that the most likely explanation for Roche's discharge was that Cambridgeport wanted to "get rid of the smaller fry, and impress the other employees" not to associate with health and safety activists. While not the only possible one, this view of the evidence was "plausible in light of the record viewed in its entirety." Anderson, 470 U.S. at 574. ________ Questions of witness credibility are particularly for the trier to resolve. United States v. Olea, 987 F.2d 874, 876 ______________ ____ (1st Cir. 1993). We cannot say the court clearly erred in finding that Roche was discharged because of his connection with Richardson. B. The parties stipulated that the period of back pay at issue was from the June 1989 dates of discharge until December 12, 1991. The district court calculated the damages for both employees based on the assumption that, but for their retaliatory discharges, they both would have retained their jobs for this entire period. Cambridgeport argues that this calculation was clearly erroneous and not supported by the evidence. Cambridgeport insists that its work is -6- cyclical, and that given Richardson's lack of general sheet metal workers' skills and Roche's poor work history, both employees would have been laid off long before December 1991. Again, the district court's findings depended in large part on its determination that Cambridgeport's witnesses lacked credibility. The district court did not believe the Cambridgeport witnesses' assertions that the work for which Richardson had been hired "fell off," nor did it believe that his work performance was unsatisfactory. In the court's view, the defendant's reasons for limiting its liability vis-a-vis Richardson were "likely trumped up." There was evidence that Richardson's ability and character were, overall, in the words of the court, "satisfactory," and that less than a week after his discharge, the company hired a new employee to do the exact work that Richardson had been doing. Moreover, there was evidence that Richardson could do non-welding work and could have been transferred to such work if the "pure welding" work "fell off." There was also sufficient evidence in the record for the court to disbelieve Cambridgeport's contention that Roche would have been laid off soon after June 1989 "in accord with the cyclical swings of employment, and not rehired." Cambridgeport placed an advertisement in the local newspaper for "shop laborers" on the day Roche was discharged -7- and subsequently hired workers in the department where Roche worked. On reading the record as a whole, we cannot say the court's view of the evidence was implausible. It was not, therefore, clear error for the court to calculate the employees' back pay award on the basis of an assumption that, but for their retaliatory discharges, they both would have retained their jobs for the entire stipulated period. II. The Secretary advanced the view at trial that the appropriate measure of damages for both employees was an amount equal to twice their back pay losses. The Secretary argued to the district court that doubling back pay losses would not be a penalty, but would serve "to compensate[] for the effects of loss of pay upon the victim[s]." _______ The court adopted the Secretary's measure of damages, saying that "the conduct of this defendant, both in and out of court, is so consistently brash that [the court] feels justified in finding doubling the lost wages award, but to serve to cover additional damage plus prejudgment interest." The court later supported its doubling of the award by "calling for special support of the statutory purpose when an employer flaunts it both by word and by openly unambiguous conduct." -8- Cambridgeport argues that doubling the back pay award amounted to an award of punitive, or exemplary, damages, and was unauthorized by the OSH Act. It insists that courts interpreting the statute have uniformly limited recovery in cases of retaliatory discharge to back pay, employment search expenses, and in some instances, prejudgment interest. The Secretary contests the characterization of the award as exemplary. He argues that the court's statement that double wages served "to cover additional damage plus prejudgment interest" shows an intention to grant compensatory damages, and that the record supports the award on that basis. The Secretary concedes that this is the first reported case in which double damages have been awarded under the OSH Act. But he insists that the case also represents the first time the Secretary has actually asked for such damages. _____ A. The question of whether the district court was within its authority to authorize double back pay damages turns on an interpretation of Section 11(c) of the OSH Act, 29 U.S.C. 660(c). This is a question of law, subject to our review de novo. United States v. Jones, 10 F.3d 901, 904 __ ____ _____________ _____ (1st Cir. 1993). The relevant provision reads: Any employee who believes that he has been discharged or otherwise discriminated against -9- by any person in violation of this subsection may . . . file a complaint with the Secretary alleging such discrimination. . . . If [after appropriate] investigation, the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person. In any such action the United States district courts shall have jurisdiction, for cause shown to restrain violations . . . and order all __________ appropriate relief including rehiring or ____________________ reinstatement of the employee to his former position with back pay. 29 U.S.C. 660(c)(2) (emphasis added). We must decide whether the district court's awarding of damages equal to twice the employees' lost back pay was "appropriate relief" within the meaning of the statute and under the facts of the case. The Secretary urges that we interpret 11(c) in the light of Franklin v. Gwinnett County Public Sch., 112 S. ________ ___________________________ Ct. 1028, 1032 (1992). In Franklin, the Supreme Court ruled ________ that federal courts may award monetary damages in private actions brought to enforce Title IX of the Education Amendments of 1972, 20 U.S.C. 1681-1688 ("Title IX"). Id. ___ at 1038. Congress did not explicitly provide for private actions in Title IX; however, the right to bring private actions was earlier "implied" by the Court in Cannon v. ______ University of Chicago, 441 U.S. 677 (1979). Even absent an _____________________ express right to sue, monetary damages were held to be available because the Court "presume[s] the availability of all appropriate remedies unless Congress has expressly -10- indicated otherwise." Franklin, 112 S. Ct. at 1032. The ________ Court announced "[t]he general rule . . . that absent clear ____________ direction to the contrary by Congress, the federal courts ___________________________ have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Id. at 1035 (emphasis added). ___ The instant case differs from Franklin in that we ________ are here construing Congress's meaning when, in creating an __________ express cause of action for the Secretary of Labor to institute on behalf of an aggrieved employee, it licensed courts to "order all appropriate relief." In Franklin, "all ________ appropriate remedies" were the Court's words, not Congress's. Nonetheless, the parallel is unmistakable. It is hard to believe that the Supreme Court having presumed that an implied private right of action included "all appropriate remedies" or "any appropriate relief," and having construed remedies so described to include "monetary damages" and "any of the procedures or actions normally available . . . according to the exigencies of the particular case," 112 S. Ct. at 1034 would construe less generously Congress's similar phrase, "all appropriate relief." We think Franklin strongly suggests that "all appropriate ________ relief" as written in 11(c) embraces monetary damages as well as other relevant forms of relief normally available, -11- Congress having provided no "clear direction" to the contrary. See 112 S. Ct. at 1035. ___ Cambridgeport, nonetheless, would have us find here "clear direction to the contrary" because the phrase "all appropriate relief" is succeeded by the words, "including rehiring or reinstatement of the employee to his former position with back pay." This, we are told, evinces a Congressional intent to limit relief to those remedies expressly mentioned, or at least to the kinds of remedies _____ mentioned. Cambridgeport contends that given the express delineation of certain remedies, "[t]here is nothing to suggest that Congress affirmatively intended [] an expansive interpretation" of 11(c), and that double damages are therefore unauthorized under the OSH Act. However, the key language of the OSH Act is broad. It authorizes a court to "order all appropriate relief." The further language including certain remedies, like _________ reinstatement, indicates the availability of the named remedies, but does not purport to limit "all appropriate relief" to those remedies only. The mere naming of certain included remedies neither suggests nor is a "clear direction" that other remedies are precluded. See Franklin, 112 S. Ct. ___ ________ at 1035; Federal Land Bank of St. Paul v. Bismark Lumber Co., _____________________________ __________________ 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one -12- of all-embracing definition, but connotes simply an illustrative application of the general principle."). We conclude that the phrase "all appropriate relief" under 11(c) includes "monetary damages" as specifically held in Franklin. Moreover, given the expansive ________ language in Franklin ("[t]he general rule . . . that absent ________ clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute," 112 S. Ct. at 1035), it is difficult to exclude even exemplary damages where otherwise justified in _________ particular circumstances. Later, analogous federal statutes protecting "whistleblowers" expressly list exemplary damages as within the rubric of "all appropriate relief." For example, 42 U.S.C. 5851 protects whistleblowers in nuclear facilities from retaliatory discharge and discrimination. The jurisdiction provision of the statute provides in relevant part: In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief including, but not limited to, injunctive relief, compensatory relief, and exemplary damages. 42 U.S.C. 5851(d). See also 15 U.S.C. 2622(d) (toxic _________ substances) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief, including injunctive relief and -13- compensatory and exemplary damages."); 42 U.S.C. 300j- 9(i)(4) (safety of public water systems) (courts may "grant all appropriate relief including, but not limited to, injunctive relief, compensatory, and exemplary damages"); 42 U.S.C. 7622(d) (air pollution) (courts may grant "all appropriate relief including, but not limited to, injunctive relief, compensatory, and exemplary damages"). By expressly identifying exemplary damages as authorized under these similar statutes, Congress recognizes exemplary damages as falling within the term "all appropriate relief." To be sure, the express mention of exemplary damages in these other statutes can be said to reflect doubt whether, without such reference, the term would necessarily include exemplary damages. Under the broad and unequivocal language in Franklin, however, the absence of an explicit ________ _______ mention in the OSH Act would not seem enough to take from the courts their "'"power to utilize any of the procedures or actions normally available . . . according to the exigencies of the particular case."'" Franklin, 112 S. Ct. at 1034 ________ (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 433-34 (1964), _____________ _____ in turn quoting Deckert v. Independence Shares Corp., 311 _______ __________________________ U.S. 282, 288 (1940)). Where Congress itself has recognized, in these other statutes, that "all appropriate relief" may include exemplary damages, it is difficult to see why the -14- mere omission of the specific reference should compel a narrower reading. Courts have traditionally had the power in tort cases to award damages "larger than the amount necessary to reimburse actual monetary loss sustained or even anticipated by the plaintiff, and thus redress intangible elements of injury that are 'deemed important, even though not pecuniary in [their] immediate consequences[s].'" United States v. ______________ Burke, 112 S. Ct. 1867, 1871 (1992) (quoting D. Dobbs, _____ Remedies 136 (1973)). And in circumstances where the ________ defendant's misconduct was intentional or reckless, "punitive or exemplary damages are generally available." Id. at 1872 ___ (citations omitted). See also Molzof v. United States, 112 ________ ______ _____________ S. Ct. 711, 715 (1992) (the Supreme Court's "decisions make clear that the concept of 'punitive damages' has a long pedigree in the law"); Rowlett v. Anheuser-Busch, Inc., 832 _______ ____________________ F.2d 194, 205 (1st Cir. 1987) ("[I]n jurisdictions where punitive damages are authorized, punitive damages are within the jury's discretion in cases requiring proof of intentional wrongdoing.") (citing Smith v. Wade, 461 U.S. 30, 53-54 _____ ____ (1983)). Retaliatory discharge has been treated as an intentional tort. See Travis v. Gary Community Mental Health ___ ______ ____________________________ Ctr., 921 F.2d 108, 112 (7th Cir. 1990); see also W. Page ____ ________ Keeton et al., Prosser and Keeton on the Law of Torts, 130, ______________________________________ at 1027-29 (5th ed. 1984). -15- Perhaps the strongest argument for distinguishing Franklin, and deciding that punitive damages are not ________ available under 11(c) of the OSH Act, lies in certain aspects of its legislative history and in the practice of not awarding such damages under certain other federal statutes. In the version of the OSH Act reported to the full Senate from the Committee on Labor and Public Welfare, the Act provided only for administrative action to obtain relief for an employee discriminated against for asserting rights under the Act. See S. Rep. No. 1282, 91st Cong. 2d Sess., 34-35 ___ (1970), reprinted in Legislative History of the Occupational ____________ _______________________________________ Safety and Health Act of 1970, at 174-75 (1971) ("Legislative _____________________________ ___________ History"); S. 2193, 91st Cong., 2d Sess., 10(f) (1970), _______ reprinted in Legislative History at 261; Conf. Rep. No. 1765, ____________ ___________________ 91st Cong., 2d Sess., 39 (1970), reprinted in Legislative _____________ ___________ History at 1192. This Senate version allowed employees who _______ believed they were discriminated against to apply to the Secretary for an investigation of such alleged discrimination. S. 2193, supra, 10(f). After appropriate _____ investigation, which could include a public hearing, the Secretary was to make findings of fact. If the Secretary found that a violation of the Act had occurred, the Secretary was to order "the person committing such violation to take ____ such affirmative action to abate the violation as the _________________________ Secretary deems appropriate, including, but not limited to, ___________________________________________________ -16- the rehiring or reinstatement of the employee to his former _____________________________________________________________ position with back pay." Id. (emphasis added). ______________________ ___ This language authorizing the Secretary to order "such affirmative action" was similar to the language used in the remedial provisions of both the National Labor Relations Act ("the NLRA") and of Title VII of the Civil Rights Act of 1964 ("Title VII"). Section 10(c) of the NLRA authorizes the National Labor Relations Board to investigate allegations of unfair labor practices and, if the allegations are found to be true, to order "such affirmative action including __________________________ reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. 29 U.S.C. 160 (emphasis added). Similarly, 706(g) of Title VII authorizes courts hearing a complaint of discrimination to "order such ____ affirmative action as may be appropriate, which may include, __________________ but is not limited to, reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate." 42 U.S.C. 2000e-5 (emphasis added). This provision was expressly modeled after 10(c) of the NLRA. See Abermarle Paper Co. v. Moody, 422 ___ ____________________ _____ U.S. 405, 419 & n.11 (1975); Robert Belton, Remedies in ___________ Employment Discrimination Law 13.3 at 430 (1992). _____________________________ The similarity of the Senate's early version of what became 11(c) of the OSH Act to both 10(c) of the -17- NLRA and 706(g) of Title VII suggests that the Senate meant to incorporate into its version of the OSH Act the same kinds of remedies that were available under the NLRA and Title VII. And in choosing such remedies, the Senate was presumably aware that, as early as 1938, the Supreme Court had held that punitive damages were not available under the NLRA.2 ___ Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235-36 (1938); _______________________ ____ see also Republic Steel Corp. v. NLRB, 311 U.S. 7, 12 (1940). ________ ____________________ ____ The Court had interpreted the NLRA's language by explaining that the power to command "affirmative action" was remedial rather than punitive. Consolidated Edison, 305 U.S. at 236; ___________________ see also Republic Steel, 311 U.S. at 12. ________ ______________ Therefore, if this language allowing courts to order "affirmative action" had been retained in the final version of the OSH Act, we would be in a position similar to those courts that have interpreted Title VII as not providing for punitive damages, basing their decisions in part on the fact that if punitive damages are not available under 10(c) of the NLRA, they should not be available under statutes modeled after that provision. See, e.g., Richerson v. Jones, ___ ____ _________ _____ 551 F.2d 918, 927 (3d Cir. 1977) (noting that "close relationship" between Title VII provision and NLRA provision ____________________ 2. At the time of the reporting of the Senate version in October 1970, the provision of punitive damages under Title VII had not been the subject of review by the Supreme Court or any court of appeals. See Belton, supra at 13.3 nn.33- ___ _____ 34. -18- "provides additional evidence that Congress did not intend to authorize" punitive damages under Title VII); Harrington v. __________ Vandalia-Butler Board of Education, 585 F.2d 192, 196-97 (6th __________________________________ Cir. 1978), cert. denied, 441 U.S. 932 (1979); Walker v. Ford ____________ ______ ____ Motor Co., 684 F.2d 1355, 1363-64 (11th Cir. 1982); see also __________ ________ DeGrace v. Rumsfeld, 614 F.2d 796, 808 (1st Cir. 1980). _______ ________ The final bill, however, was a product of compromise between the Senate and House versions and did not include the Senate language allowing only for "such affirmative action" as the Secretary deemed appropriate. The penalties in the House version of the OSH Act had been different and stronger than those in the Senate version. The House bill had called for civil and criminal penalties for employers who discriminated against employee whistleblowers. See Conf. Rep. No. 1765, supra, at 39. The final language, ___ _____ making specific the jurisdiction of the district courts in actions brought by the Secretary and allowing courts to provide "all appropriate relief," emerged from a conference committee. One might argue, perhaps, that the substitution of the phrase "all appropriate relief" for "such affirmative action" evinced merely careless drafting rather than a legislative intent to broaden the remedies available. The conference report says nothing about an intent to broaden the Senate's remedies. Nonetheless, there is a significant -19- and obvious distinction between the right to order the offender "to take such affirmative action to abate the violation as the Secretary deems appropriate, including . . ." and authorizing a court "to order all appropriate relief, including . . . ." The final bill was a product of compromise the Senate allowed the Secretary to bring causes of action in the district courts; the House gave up on criminal penalties. In this atmosphere of "substantial give and take," see 116 Cong. Rec. 42,200 (1970) (remarks of Rep. ___ Perkins), reprinted in Legislative History at 1200, it is ____________ ___________________ hardly obvious, where different language was used, that the conference committee desired merely to transfer to a federal court the exact same set of remedies the Senate gave to the Secretary of Labor in its earlier version. Indeed, it would seem inconsistent to assume, on the one hand, that Congress intends to incorporate an entire remedial scheme when it uses a term of art in a statute, see, e.g., Richerson, 551 F.2d at ___ ____ _________ 927, but to assume that, on the other hand, when Congress omits the term of art and adopts different language, that it did so inadvertently. Choice of the terminology "all appropriate relief" suggests that Congress might have been looking more to the language of the Labor-Management Reporting and Disclosure Act of 1959, which outlines a "bill of rights" for union members, 29 U.S.C. 411(a), and provides that actions for violation -20- of those rights may be had to recover "such relief (including injunctions) as may be appropriate." 29 U.S.C. 412. At the time of the passage of the OSH Act, the only court of appeals that had ruled on the issue had held that 29 U.S.C. 412 allowed for punitive damages. International Bhd. of ______________________ Boilermakers v. Braswell, 388 F.2d 193, 199-201 (5th Cir.), ____________ ________ cert. denied, 391 U.S. 935 (1968).3 If we were to presume ____________ that the language of 11(c) was modeled after previous labor legislation, the similarity to the language of the Labor- Management Reporting and Disclosure Act of 1959 would support our decision here. We cannot find, therefore, in the legislative history of the OSH Act any "clear direction" that the term "all appropriate relief" was intended to deny to the courts remedial powers to award compensatory and punitive damages in a cause of action analogous to an intentional tort. See ___ Smith, 461 U.S. at 48-49 ("As a general matter, we discern no _____ reason why a person whose federally guaranteed rights have been violated should be granted a more restrictive remedy ____________________ 3. Other courts of appeals that have since ruled on the issue are in agreement. See, e.g., Cooke v. Orange Belt ___ ____ _____ ___________ Dist. Council, 529 F.2d 815, 820 (9th Cir. 1976); Morrissey _____________ _________ v. National Maritime Union, 544 F.2d 19, 24-25 (2nd Cir. ________________________ 1976); Keene v. IUOE Local 624, 569 F.2d 1375, 1381-1382, & _____ _______________ n.8 (5th Cir. 1978); see also International Bhd. of Elec. _________ _____________________________ Workers v. Foust, 442 U.S. 42, 47 n.9 (1979) (reserving _______ _____ decision on this point). -21- than a person asserting an ordinary tort cause of action.").4 We conclude, in accordance with the meaning of the same words as used in Franklin, that the statutory power to ________ award "all appropriate relief" gave the district court authority, where such relief is in fact appropriate, to award compensatory and even such traditional other relief as exemplary damages. That authority would be broad enough to support an award of twice the employees' pay provided the facts and circumstances of this case justified such an award ____________________ 4. Cf. Individuals with Disabilities Education Act, 20 ___ U.S.C. 1401-1485, which requires participating state and local educational agencies "to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education" to such handicapped children. 20 U.S.C. 1415(a). This procedural framework offers the parents an opportunity to contest any decision made by the state regarding the child's identification, evaluation, or educational placement through appropriate administrative procedures and, if necessary, in state or federal court. In such civil actions, the court "shall grant such relief as the court determines is appropriate." 20 U.S.C. 1415(e)(2). Courts have split in determining whether this statute allows for punitive damages. Cf. Marvin H. v. Austin Indep. ___ _________ _____________ Sch. Dist., 714 F.2d 1348, 1356 (5th Cir. 1983) (procedural __________ focus of Act means that relief under 1415(e)(2) "generally includes only prospective relief" and does not include compensatory or punitive damages); Woods on behalf of T.W. v. _______________________ New Jersey Dept. of Educ., 796 F. Supp. 767, 776 (D.N.J. ___________________________ 1992) (punitive damages available); see also Burlington Sch. _________ _______________ Comm. v. Mass. Dept. of Educ., 471 U.S. 359, 369 (1985) _____ _____________________ ("ordinary meaning of these words [to 'grant such relief as the court determines is appropriate'] confers broad discretion on the court"). -22- as additional compensation and as deserved punitive or exemplary damages. B. Our final inquiry, then, is whether the court abused its discretion in deciding on this record that double damages relief was "appropriate," bearing in mind that determination of the amount of damages "falls within the sound judgment and discretion of the factfinder." Soto v. ____ United States, 11 F.3d 15, 18 (1st Cir. 1993). _____________ Here, accepting the court's findings of fact which we think were not clearly erroneous, we cannot say the award was unreasonable. There was evidence that both Richardson and Roche incurred monetary losses because of their discharges in addition to their lost back pay. The district court stated that a portion of the award covered prejudgment interest, which, depending on the interest rate chosen by the court, could itself amount to more than 35% of the back wages owed. In addition, the court concluded that the defendant's conduct, "both in and out of court, [was] consistently brash," suggesting a belief that exemplary damages were in order. The court found that Cambridgeport had intentionally retaliated against Richardson and had fired Roche as an example to other employees. The court also noted that its "general picture" of the defendant was informed by -23- the testimony of a Labor Department investigator who testified that, during the Secretary's investigation of the employees' termination, a member of Cambridgeport management had offered the investigator a case of wine, possibly in an attempt to influence the investigation. Moreover, the court found that Cambridgeport during trial had revealed itself as "a tough outfit" that "more than passively observed; it supervised its witnesses." Given these findings, and the conduct of the defendant as assessed by the court, the court did not exceed its discretion in awarding double back pay damages. Affirmed. Costs to appellee. ________ _________________ -24-