**Robert B. REICH, Secretary of Labor, United States Dept. of Labor [1],**

v.

**SKYLINE TERRACE, INC. d/b/a Skyline Terrace Nursing Center, Defendant.**

No. 95–C–676–K.

United States District Court, N.D. Oklahoma.

May 22, 1997.

---

1. Mr. Reich is no longer Secretary of Labor, but held that office during the trial of this action.

James E. White, Thomas S. Williamson, Jr., Jack F. Ostrander, Terry Goltz Greenberg, Connie M. Ackermann, Brian L. Pudenz, Daphne A. Brechun, Mary Kathryn Schopmeyer, U.S. Dept. of Labor, Office of the Solicitor, Dallas, TX, for Plaintiff.

Sharon K.W. Doty, Tulsa, OK, John O. Dean, Tulsa, OK, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERN, Chief Judge.

The above-styled case was tried to the Court without a jury, and evidence was presented from October 23, 1996 through October 25, 1996. Post-trial briefing was completed February 10, 1997. After considering the pleadings, the testimony and exhibits admitted at trial, all of the briefs and arguments presented by counsel for the parties, and being fully advised in the premises, the Court enters the following Findings of Fact, Conclusions of Law and Judgment, in accordance with Rule 52 F.R.Cv.P., as follows:

### FINDINGS OF FACT

1. This is an action brought by the Secretary of Labor against defendant nursing home pursuant to 29 U.S.C. § 660(c)(2), alleging defendant discharged an employee, Rosemary Cook, because she filed a complaint with the Oklahoma State Department of Health and the Occupational Safety and Health Administration ("OSHA"), which contended safety and health hazards existed at her place of employment.

2. Rosemary Cook ("Cook") resides in Broken Arrow, Oklahoma, which is in the Northern District of Oklahoma.

3. Skyline Terrace, Inc. d/b/a Skyline Terrace Nursing Center ("Skyline Terrace"), is an Oklahoma corporation having an office and a place of business in Tulsa, Oklahoma, which is in the Northern District of Oklahoma.

4. At all relevant times, Cook was employed by Skyline Terrace and was an "employee" employed by an "employer" as those terms are defined in 29 U.S.C. § 652(5) and (6). (Pretrial Order, II. 2).

5. Skyline Terrace regularly employs licensed nursing personnel to provide necessary care to all residents. There are three shifts per day, every day, for its nursing care personnel. The shifts are 7 a.m. to 3 p.m. ("7–3"), 3 p.m. to 11 p.m. ("3–11"), and 11 p.m. to 7 a.m. ("11–7").

6. Among the levels of care provided by Skyline Terrace are an infirmary unit, a Medicare skilled nursing unit and a "secure" unit which provides special care to certain residents who might wander off and place themselves at risk of harm. Many patients sleep through the night but require periodic checking to change soiled or wet briefs or "turning" to prevent bedsores.

7. Skyline Terrace is licensed by the Oklahoma State Department of Health, which also conducts on-site surveys periodically for licensing. From time to time,

Skyline Terrace is also surveyed based on complaints made to the State Health Department. These inspections are unannounced.

8. At the time a Health Department inspector arrives for the investigation, site administrators are made aware of the nature of the complaint during the opening conference. A copy of the findings is available after the investigation is complete if site administrators request the information by mail. The investigator is required not to reveal the identity of the complainant.

9. Cook made application to Skyline Terrace for employment as a nurse just after she completed her nursing education at Tulsa Junior College (now "Tulsa Community College") in May, 1994.

10. Cook obtained an interview in June, 1994, with Linda Lyons Coyle, the director of nurses at Skyline Terrace.

11. Cook had no previous experience as a supervisor at the time she was interviewed by the director of nursing for the Skyline Terrace job, although she had done a "management rotation" in nursing school. (Tr. 30.23–25).

12. She was offered a job during the interview and was hired as an at-will employee for a probationary period, commencing June 11, 1994. Cook did not perceive any reservations on Coyle's part about hiring Cook. (Tr. at 39.14–21).

13. Cook was hired as House Supervisor on the 11–7 shift, and it was Cook's understanding she would also assume the responsibilities of "charge nurse" for the infirmary room and the Medicare room. (Tr. at 38.8–18).

14. Cook was initially trained by Judy O'Brien, the "weekend option RN supervisor." (Tr. at 41.18–25).

15. Cook received eight days of training, the final day of training being June 22, 1994. (Tr. at 42.12–17).

16. O'Brien showed Cook how to take water temperatures in the facility, but O'Brien (who was serving as 11–7 House Supervisor at the time) told Cook that O'Brien had never taken the water temperatures. (Tr. at 44.23–45.2).

17. O'Brien did not emphasize that the taking of water temperatures was an important part of the job, or even why water temperatures were taken. (Tr. at 45.24–46.3).

18. Linda Lyons Coyle did not tell Cook why the taking of water temperatures needed to be done. (Tr. at 46.7–11).

19. Cook was not told during training that one of her duties was to train or orient new nurse aides and did not receive a check list to do so. (Tr. at 46.15; 46.24–47.4).

20. Any documents or forms, including "report to administration" forms, which Cook filled out had to be slipped under the front office door because Cook did not have a key. (Tr. at 47–48).

21. Cook testified that she had to respond to "incidents" (e.g., conflicts between patients and employees) almost every night. (Tr. at 56.16). If an 11–7 employee did not appear for work, it was Cook's responsibility to ask a 3–11 employee to stay over. (Tr. at 57.3–5).

22. Cook described the 11–7 shift as "extraordinarily busy". (Tr. at 66.13). She met with Linda Lyons Coyle on June 22, 1994 and discussed Skyline Terrace's glove policy. Coyle related that gloves were only to be worn when the nurse saw visible blood. Cook stated that Cook wished to wear gloves whenever she might come in contact with bodily fluids, and Coyle granted permission. (Tr. at 75.25–76.4).

23. Cook described arriving at work on June 27, 1994 and finding no protective gloves for the staff.[2] (Tr. at 77). On that evening, the staff used the personal glove supply of Jennifer Zewalk, a nurse aide, and ultimately used the special facility supply of expensive sterile gloves. (Tr. at 77–78). Cook submitted a "report to administration" form relating the lack of gloves. (Tr. at 78.3–5).

---

**2.** The transcript at 77.4 refers to "June the 22nd", but in context it is clear that June 27 was intended by the questioner.

24. On the next morning, June 28, 1994, Cook orally reported the incident to "[e]verybody I ran into." (Tr. at 79.7).

25. Again, no regular use latex gloves were present in the facility on June 28, 1994. Again, Cook submitted a written report to the administrative office and an oral report to the nurses. (Tr. at 79–80).

26. Upon Cook's arrival at work on June 29, 1994, she again found no regular use latex gloves. A note had been placed on the nurses' station. (Tr. at 80.24–25). The note, (Plaintiff's Exhibit 9), stated in part that medical supplies should only be ordered once a week. Further, that "an extremely large quantity of gloves[3] is being requested. Please use your gloves as directed, only. Thanks, Sandy". Sandy was identified as a secretary in the front office. Cook used her own gloves which she had purchased and again sterile gloves were used. (Tr. at 82.10–13). The nursing staff was upset at the lack of gloves. (Tr. at 82.16).

27. When Cook arrived at work June 30, 1994, she was informed by Pat Hilton that Jennifer Zewalk had quit. Only two other employees, Sharon Deaver and Maxine Love, were present. (Tr. at 84.4–6).

28. Cook called Linda Lyons Coyle to report the "critical staffing shortage". (Tr. at 84.16). Cook called Coyle other times during the night. (Tr. at 85.6;85.17). Cook estimated four or five such calls were made. (Tr. at 88.6). Linda Lyons Coyle told Cook the next day that Cook had done a "fantastic job". (Tr. at 89.20).

29. On July 7, 1994, a nurse aide at Skyline Terrace named Tichelle Hunt had a "hypoglycemic episode". (Tr. at 90.3–4). Cook, unaware of the nature of Hunt's medical condition, called Linda Lyons Coyle. (Tr. at 94.13). Coyle told Cook to instruct Hunt to leave the premises. (Tr. at 94.24). Cook did so, but Hunt did not leave. (Tr. at 95). Cook called Coyle again, who instructed Cook to call the police, (Tr. at 96.4), which Cook did (Tr. at 96.19). The police obtained Hunt's driver's license, which contained a medical restriction. Cook then tested Hunt's blood sugar and, upon discovering hypoglycemia, administered orange juice and milk. (Tr. at 100.16). Hunt thereupon recovered from the episode. Linda Lyons Coyle again told Cook she had done a "good job" regarding the incident. (Tr. at 102.21).

30. Cook continued to be concerned about the glove supply at Skyline Terrace (Tr. at 103.3–6), and on July 5, 1994, she notified the Oklahoma State Department of Health and OSHA. (Tr. at 103.10–13).

31. The seven specific allegations made by Cook are set forth on the first page of Plaintiff's Exhibit 2. The remaining pages of that Exhibit contain the findings of Karel Putman, the Health Department investigator.

32. Putman visited Skyline Terrace, unbeknownst to Cook, on July 13 and 14, 1994. (Tr. at 154.16).

33. Cook worked the night of July 14, 1994, did not work July 15 and 16, and returned to work July 17, 1994. (Tr. at 112–13).

34. When Cook came in the night of July 17, she found a note from Linda Lyons Coyle, asking Cook to call Coyle the next morning. Upon calling, Cook was told to attend a meeting with Coyle, which she did. (Tr. at 113).

35. At the meeting, Coyle told Cook she was terminated, and gave three reasons: (1) ten nurse aides had quit since Cook had been hired and that showed she had poor management skills; (2) Cook had not recorded water temperatures in the building; (3) Cook had not followed behind her nurse aides to insure they completed their work. (Tr. at 114).

36. Coyle provided no documents, and requested no response from Cook. (Tr. at 114.21). Cook also testified Coyle had never previously raised concerns about any of these purported reasons. (Tr. at 115.1–12).

37. Soon after termination, Cook learned the State Department of Health had inspected Skyline Terrace days before her termination.[4] (Tr. at 115.25).

---

3. The transcript at 81.14 mistakenly substitutes the word "drugs" for "gloves".

4. The thoroughness of the inspection is somewhat suspect. Putman testified that, faced with an allegation that a nurse at Skyline Terrace had

38. Cook was out of work from July 18, 1994 until September 19, 1994. (Tr. at 118.20). She obtained work at a hospital in Paris, Texas, where she is presently employed. She incurs expenses for commuting from Broken Arrow to Paris, and for food. (Tr. at 119–121).

39. During her testimony, Coyle attempted to deny any knowledge that Cook was the complainant. Despite the testimony of Putman that she read and discussed the complaint with Coyle on the second day of the investigation (Tr. at 155), Coyle attempted to establish that Putman had only discussed at most four or five of the complaint items with her. However, upon review of Putman's report, Coyle admitted that Putman discussed all of the allegations in Cook's complaint with Coyle. (Tr. at 355–56).

40. Sue West testified that she told Coyle in June, 1994 that Cook was concerned about the lack of gloves at Skyline Terrace. (Tr. at 574–75).

41. Suggesting why she did not see the requests for gloves, Coyle testified that the "reports to administration" forms were cut up and each portion sent to the appropriate department. (Tr. at 311–313). On cross-examination, Coyle admitted that several of the reports to administration entered as exhibits in this case had notations in the maintenance portion and had not been cut up. (Tr. at 390–392).

42. Coyle suggested that Sandy Simmons, the receptionist, had the authority to write and distribute a note regarding glove usage throughout the facility without management's knowledge or approval. (Tr. at 403–404).

43. The two documents created by nurses Lisa Spanberger and Glenda Burkhart to allegedly document the conditions of their patients on the morning of July 14, 1994, are not credible. Burkhart was the charge nurse

on the 7–3 shift for the infirmary ward at the time. She testified that she arrived at work the morning of July 14, 1994 and discovered Cook's favorable evaluation (Plaintiff's Exhibit 27; Defendant's Exhibit 10) of Tammy Davis, a nurse aide employed at Skyline Terrace.

44. Burkhart testified that she became "frustrated" (Tr. at 438.20) upon seeing the evaluation because Burkhart believed Davis "really wasn't doing her work". (Tr. at 439.2). Burkhart created Defendant's Exhibit 8 in response to the Cook evaluation of Davis. (Tr. at 439.23—440.1). Burkhart testified that Exhibit 8 represents her assessment of the patients on the floor that morning. For example, next to patient names are the following entries: "bed and diaper completely soaked[.] Lashaun said she thought diaper was marked 10:15—no initials"; "last change 11:55 PM—soaked ..."; "last change 11 PM—bed and diaper completely soaked"; "last change 11 PM—bed and diaper soaked." Asked why she had never made a written record of the poor care provided by Cook and Davis until July 14, 1994, Burkhart replied "I just didn't". (Tr. at 443.12).

45. Lisa Spanberger was the house supervisor on the 7–3 shift in July, 1994. Spanberger testified that she created Defendant's Exhibit 9 because Burkhart had shown Spanberger the favorable evaluation of Davis written by Cook. (Tr. at 492.7–15). Defendant's Exhibit 9 also lists patients' names and their conditions. Four separate entries state that a patient had an unchanged diaper which had been marked "2320" and initialed "T.D." (When a diaper was changed, the nurse aide was to write the time of the change and initial the diaper).[5]

46. Tammy Davis, the subject of their comments, was never fired or even reprimanded, and continued working at Skyline

---

Hepatitis B, she satisfied herself by inquiring of the director of nurses. (Tr. at 196–97).

**5.** Spanberger also created Plaintiff's Exhibit 26, a note to Linda Lyons Coyle dated July 15, 1994. Spanberger lists two asserted transgressions by Cook: (1) writing down the wrong name for an employee who called in sick that morning and (2) making no attempt to find a replacement for

an employee who called in sick July 9, 1994, almost one week before the note was written. Listing the second incident, in particular, smacks of collecting all negative information for the inevitable termination. In rebuttal, Cook testified that the incident regarding the clogged tube recorded in Defendant's Exhibit 8 actually took place July 5, 1994. (Tr. at 629.6–8).

Terrace until mid-September of 1994. Davis as a witness made a highly persuasive attack upon the authenticity of the documents by pointing out that she always recorded the time on patients' briefs in military time and even had a watch set in military time to assist her. (Tr. at 592, 603, 625–26). Thus, Davis testified, she never would have made an entry such as "11:55 PM" (Tr. at 603.23). Davis also stated that she would record the exact time on a brief, and thus Spanberger's notes which indicated that all the diapers were marked "23 20" must be incorrect. (Tr. at 601; Defendant's Exhibit 9).

47. Defendant's purported reason for termination that "Skyline Terrace hired and lost a record ten nurse aides on Ms. Cook's shift" utterly fails. Coyle testified she did not ask a single nurse aide why she quit and no one told her that any quit because of Cook. (Tr. at 406–08). Evidence was presented of consistent high turnover among aides at Skyline Terrace, and the testimony further indicated Cook was well liked and respected by the nurse aides.

48. Coyle contended another reason for terminating Cook was that Cook pulled aides from the North wing to help Cook with patient care on the Infirmary and Medicare wings. (Tr. at 321). Sharon Deaver testified that other supervisors had pulled aides off the North wing. (Tr. at 417). Tammy Davis testified she was pulled off the North wing even after Cook was terminated. (Tr. at 593).

49. The records from Interim Health Care do not support defendant's assertion that, during Cook's tenure, Skyline Terrace was forced to obtain temporary nurse aides for the first time in the facility's history. (Plaintiff's Exhibit 30, p. 4). The Court does not find credible Coyle's explanation that she filled nurse aide positions with more expensive LPNs during this time.

50. Tichelle Hunt testified that she had informed Coyle less than one week prior to the hypoglycemia incident of Hunt's medical condition. (Tr. at 541–42). Hunt testified she never told Cook she was a diabetic. (Tr. at 545). The Court finds Cook's account of the Hunt incident to be credible.

51. Although Cook did not take the water temperatures, the evidence indicates that other individuals who had failed to take water temperatures had not been fired and that taking water temperatures was not a high priority at Skyline Terrace.

52. The purported increase in "skin breakdowns" during Cook's tenure is not supported by the evidence.

To the extent that any of these Findings of Fact constitute Conclusions of Law, they should be so considered.

### CONCLUSIONS OF LAW

1. This is a civil action arising under the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq* ("the Act"). The Court has subject matter jurisdiction under 29 U.S.C. § 660(c)(2).

2. The Court has personal jurisdiction over the parties and venue is proper under 28 U.S.C. § 1391(b).

3. In a case of alleged retaliation, the plaintiff must first make a prima facie case by showing (1) participation in a protected activity, (2) a subsequent adverse action by the employer, and (3) some evidence of a causal connection between the protected activity and the subsequent adverse action. Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate an appropriate non-discriminatory reason for its action. Finally, if the employer satisfies this burden, the plaintiff must then demonstrate that the proffered reason is pretextual. *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 365 (8th Cir.1994).

4. Defendant conceded at trial the first two elements of the prima facie case. (Tr. at 245.8–9). Defendant was correct, for the complaint to the state agency was "protected activity" pursuant to 29 C.F.R. § 1977.9(b), and Cook suffered adverse employment action. Upon defendant's motion for directed verdict, the Court found a prima facie case had been established, describing in detail the evidence from which an inference of the third element, "causal connection" could be made. (Tr. at 258–60). The Court hereby adopts that discussion by reference.

To summarize the discussion, the brief time period of four days between state inspection and Cook's termination, coupled with the allegations in the complaint from which Cook could have been identified, were more than sufficient to support a conclusion of causation.

5. Skyline Terrace has met its burden of articulating an appropriate non-discriminatory reason for its action. Defendant contends Cook was terminated for poor work performance, and its witnesses testified as to numerous examples of such conduct.

6. Moving to the third stage of the inquiry, the Court concludes the reasons offered by defendant were a pretext for its true retaliatory motive. This conclusion is based upon the Court's finding that Cook was a highly credible witness, while the defendant's major witnesses were faced with contradictions, described above, which were not overcome. Plaintiff has met its ultimate burden of proving retaliatory discharge.

7. Plaintiff has declared she does not seek reinstatement. The general range of damages under the Act includes an injunction to prohibit the employer from violating the Act in the future, back pay, and prejudgment and postjudgment interest. *Cf. Reich v. Cambridgeport Air Systems, Inc.*, 26 F.3d 1187, 1190 (1st Cir.1994); *Donovan v. George Lai Contracting, Ltd.*, 629 F.Supp. 121 (W.D.Mo.1985).

8. Defendant presented no evidence contradicting the evidence presented by Cook that her back pay and costs total $17,917.20. Relying upon the *Reich* decision, the government argues that this amount should be doubled. In *Reich*, the First Circuit found that "all appropriate relief" under § 660(c)(2) could include an award of exemplary damages. 26 F.3d at 1194.

9. The district court in *Reich* had doubled the damages award because the conduct of the defendant had been "consistently brash", (i.e., justifying exemplary damages) and also to vaguely cover "additional damages plus prejudgment interest." *Id.* at 1190. The appellate court upheld the award, equally vaguely, finding such an award could be appropriate as "additional compensation" and as "deserved punitive or exemplary damages." *Id.*

10. This Court is uncertain what "additional compensation" the First Circuit had in mind, but declines to double this award on such a nebulous basis. Regarding punitive damages, defendant has again not addressed the issue. This Court agrees with the *Reich* court that punitive damages are available under appropriate circumstances. Under the facts of this case, namely defendant's blatant retaliation against Cook and, more egregiously, its apparent after-the-fact creation of "negative" evaluations of Cook, the Court finds this is such a case. Punitive damages in the amount of $5,000 are awarded.

11. Neither party has addressed the appropriate rate for the award of prejudgment interest. The Court will employ the rate dictated by 28 U.S.C. § 1961, (i.e., the same rate applicable to postjudgment interest). Calculated from the filing of the complaint, July 21, 1995, until date of judgment, a total of $19,907 is obtained.

12. Defendant shall also be enjoined from any additional violations of § 660(c).

To the extent that any of these Conclusions of Law constitute Findings of Fact, they should be so considered.

It is the Order of the Court that judgment be entered in favor of the plaintiff and against the defendant.

Still pending before the Court are the motion in limine of plaintiff (# 75) and the motion in limine of the defendant (# 76), which the Court took under advisement. The Court has not considered the evidence sought to be excluded in reaching its decision, and therefore these motions are declared moot.