63 F.3d 1404
 64 USLW 2158, 4 A.D. Cases 1364, 11
A.D.D. 607, 7 NDLR P 31
 Charles MORENO, an individual, Plaintiff-Appellant/Cross-Appellee,
v.
CONSOLIDATED RAIL CORPORATION, a foreign corporation,
Defendant-Appellee/Cross-Appellant.
 Nos. 94-1231, 94-1247.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 4, 1995.
Decided Aug. 29, 1995.
 
 1
 Michael D. Burwell (argued and briefed), William T. Nahikian, Burwell & Nahikian, Bloomfield Hills, MI, for plaintiff-appellant/cross-appellee.
 
 
 2
 Robert C. Ludolph (argued and briefed), Judith E. Caliman (briefed), Pepper, Hamilton & Scheetz, Detroit, MI, for defendant-appellee/cross-appellant.
 
 
 3
 Before: RYAN and DAUGHTREY, Circuit Judges; HILLMAN, District Judge.*
 
 
 4
 HILLMAN, District Judge.
 
 
 5
 This appeal first presents the question whether a railroad which receives federal funds from a state under the Federal-Aid Highways Act of 1944 ("FAHA"), 23 U.S.C. Sec. 101 et seq., is a recipient of "Federal financial assistance" within the meaning of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794. Second, it presents the question whether punitive damages are an available remedy to a plaintiff alleging intentional discrimination under section 504. Both are questions of first impression in this circuit.
 
 
 6
 Resolution of these issues requires interpretation of two statutes. First, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, ... be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" Section 505(a)(2), 29 U.S.C. Sec. 794a, which was added to the Act in 1978, makes "available" the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964 for suits under section 504 against "any recipient of Federal assistance."
 
 
 7
 Second, under the FAHA as amended by the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), 23 U.S.C. Sec. 134 et seq., the federal government provides funds to states for repair of railroad crossings. The states, in turn, identify crossings in need of repair and, using the federal funds, contract for this repair with the railroad companies which own the designated crossings.
 
 I.
 
 8
 Plaintiff, Charles Moreno, sued his former employer, defendant Consolidated Rail Corp. ("Conrail"), pursuant to section 504, alleging that defendant intentionally discriminated against him when it removed him from service as a car inspector foreman because of his disability caused by diabetes mellitus. Although plaintiff worked for defendant for thirty-six years, defendant first learned of plaintiff's diabetic condition in the fall of 1991, when plaintiff returned to work following surgery for carpal tunnel syndrome. At that time defendant's medical director requested plaintiff's medical records. Defendant's medical director learned from these records that plaintiff was diabetic, and determined plaintiff should therefore be subject to certain restrictions at work.
 
 
 9
 These restrictions, issued on December 19, 1991, and modified on December 30, 1991, included a directive to avoid irregular shifts and irregular meal breaks. On Christmas Eve, 1991, plaintiff received a letter from Conrail informing him that due to the restrictions imposed by the medical department, he was disqualified from performing his duties as supervisor.
 
 
 10
 Plaintiff subsequently filed suit against defendant Conrail in the United States District Court for the Eastern District of Michigan, alleging Conrail, in violation of section 504, intentionally discriminated against him on the basis of his disability. Defendant Conrail moved for summary judgment, contending that it had no liability under section 504 because it was not a recipient of "Federal financial assistance" within the meaning of the Rehabilitation Act. After an evidentiary hearing, the district court denied defendant's motion. The district court ruled that defendant was a recipient of "Federal financial assistance" and, therefore, an employer subject to the Act. The district court later denied defendant's motion for reconsideration of this ruling.
 
 
 11
 Plaintiff's case was tried to a jury. Defendant's motion for judgment as a matter of law and renewed motion for judgment as a matter of law were denied. The jury awarded plaintiff $62,536 for wage/benefit loss; $125,000 for pain-and-suffering and emotional distress; and $1,312,752 in punitive damages.
 
 
 12
 Defendant subsequently filed a motion for judgment as a matter of law or, in the alternative, for a new trial. The district court denied defendant's motions, except that it granted defendant's renewed motion for judgment as a matter of law with regard to the punitive damages award. The district court ruled that punitive damages were unavailable as a matter of law under section 504, and that the issue should not have been submitted to the jury. Accordingly, the court struck that portion of the award.
 
 
 13
 Plaintiff appealed, claiming that the district court erred in striking the jury's punitive damages award. Defendant cross-appealed, contending, as it did before the district court, that it was not a recipient of federal financial assistance within the meaning of section 504.
 
 II.
 
 14
 Defendant Conrail cannot be held liable for discrimination under section 504 of the Rehabilitation Act unless it was a recipient of federal financial assistance within the meaning of the Act. At an evidentiary hearing held before the district court, Conrail conceded that it received federal funds through the Job Training Partnership Act ("JTPA"), 29 U.S.C. Sec. 1501 et seq. Conrail also conceded that it received federal funds from the State of Michigan through the Federal-Aid Highways Act of 1944 ("FAHA"), 23 U.S.C. Sec. 101 et seq., as amended by the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), 23 U.S.C. Sec. 134 et seq. The district court found it unnecessary to consider whether the JTPA funds constituted federal financial assistance, since the court concluded Conrail was a recipient of federal financial assistance by virtue of its receipt of funds under the FAHA, as amended by the ISTEA. For the following reasons, we affirm the district court's conclusion under the FAHA, and we likewise decline to address the JTPA funds.
 
 The FAHA provides in part that
 
 15
 the entire cost of construction of projects for the elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossing structures, and the relocation of highways to eliminate grade crossings, may be paid from [federal funds provided under the FAHA].
 
 
 16
 23 U.S.C. Sec. 130(a).
 
 
 17
 Under the FAHA and its successor, the ISTEA, the federal government provides funds to states for repair of railroad crossings. The states, in turn, identify crossings in need of repair and, using the federal funds, contract for this repair with the railroad companies which own the designated crossings. Under this arrangement Conrail receives federal money from the State of Michigan to cover its actual costs for the crossing projects, as well as for its time and material at fair market value. The FAHA provides that railroads must reimburse the federal government to the extent they receive any net benefit from FAHA funds. 23 U.S.C. Sec. 130(c). At the same time, the FAHA further provides that the percentage of costs deemed to represent the net benefit to the railroads shall in no case exceed ten percent. 23 U.S.C. Sec. 130(b).
 
 
 18
 Based on Conrail's own admissions and other evidence introduced at the hearing, the district court made the following findings: The Railroad Safety and Tariffs Division of the Michigan Department of Transportation ("MDOT") conducts bi-annual on-site reviews of Michigan railways and issues reports and recommendations. In reliance on these reports, MDOT issues orders mandating railroad repairs as warranted, and when it does so, a railroad must comply, whether or not federal or state funds are available to assist with the upgrade. If state or federal funds are not available, the railroad is obligated to pay for the costs of the state-mandated repairs out of its own assets. Specifically, when no federal funds are available, the railroad is responsible for expenses associated with the gates, and for repairs to the rails, extending from the rail beds to a specified distance at the border of the road. The railroad is also responsible for 50% of the cost incurred for the signals and flashers.
 
 
 19
 On appeal, Conrail does not dispute these factual findings. Rather, Conrail disputes the district court's legal conclusion that on these facts, the funds Conrail receives from Michigan through the FAHA, as amended by the ISTEA, constitute federal financial assistance within the meaning of section 504. The district court concluded, on these facts, that Conrail is a recipient of federal financial assistance, because the State of Michigan provides it with federal monies to reconstruct or rehabilitate crossings which it has a preexisting duty to maintain. In this appeal, Conrail contends that on the facts before the district court, it is neither a "recipient" of funds within the meaning of section 504, nor are the funds dispersed under the FAHA "Federal financial assistance" within the meaning of section 504. Because these contentions present questions of statutory interpretation, the district court's determination is subject to de novo review. Michigan Carpenters Council v. C.J. Rogers, Inc., 933 F.2d 376, 388 (6th Cir.) ("Statutory interpretation is a question of law subject to a de novo review by this court."), cert. denied, 502 U.S. 982, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991).
 
 
 20
 As a preliminary matter, Conrail contends that in reaching its conclusion, the district court improperly focused on the purpose and language of section 504. Conrail asserts the district court should have focused instead on the purpose and language of the FAHA, the statute actually granting the funds. In United States Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the Supreme Court repeatedly emphasized that for purposes of identifying who is a recipient of federal financial assistance under section 504, the appropriate inquiry begins with the underlying grant statute. 477 U.S. at 604, 106 S.Ct. at 2710 ("We look to the terms of the underlying grant statute."); 477 U.S. at 607-608 n. 12, 106 S.Ct. at 2712 n. 12 ("Again, the relevant starting point is the grant statute."); 477 U.S. at 611, 106 S.Ct. at 2714 ("It is by reference to the grant statute ... that the relevant program or activity is determined."). In concluding that Conrail is a recipient of federal financial assistance, the district court discussed at length the statutory language and legislative history of section 504. However, the district court also properly looked to the terms and application of the FAHA. The question before this court is whether the district court was correct in concluding that funds dispersed under the FAHA constitute federal financial assistance to Conrail.
 
 A.
 
 21
 First, Conrail argues that it was not a "recipient" of the federal funds under the FAHA. Conrail points out that the State of Michigan, not Conrail, directly receives the federal funds disbursed under the FAHA. The State of Michigan, not Conrail, decides how to distribute the FAHA funds, to what entities and to which improvements. Conrail then contracts with the State in order to provide the services for improvements to the crossings under its control. Conrail's contract with the State of Michigan provides that the railroad shall bear the full cost of any items for which the railroad is responsible and which are determined not to be properly part of a project. Further, Conrail itself cannot apply directly for federal funds to upgrade particular crossings. Defendant therefore argues that the various states, not the contracting railroads, are the recipients of the federal financial assistance under the FAHA.
 
 
 22
 Conrail's argument is unpersuasive. Although Conrail receives federal funds under the FAHA indirectly, through the states, Conrail nevertheless accepts federal money, both to cover its actual costs and as compensation for the fair market value of its services on designated projects. The fact that Conrail bears any costs which are not properly part of a project is irrelevant, because the funds at issue are precisely those which are dispersed in conjunction with FAHA state projects. The State develops and applies for funds for specific projects, and it receives federal approval for FAHA funds for specific railroad crossings owned by specific railroads. Therefore, the federal funds Conrail receives are specifically earmarked for Conrail's use. The crossing upgrades are paid for with federal funds, and once they are completed, the improvements become Conrail's property.
 
 
 23
 The fact that an entity receives federal funds indirectly, through the states, does not preclude a finding that it is a recipient of federal funds. Cf. Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)(defendant college was recipient of federal financial assistance and therefore liable for sex discrimination under Title IX, even though federal funds were granted to students rather than to college's educational programs), superseded by statute on other grounds by Civil Rights Restoration Act of 1987, P.L. 100-259, 102 Stat. 28 (1988); Horner v. Kentucky High School Athletic Ass'n, 43 F.3d 265 (6th Cir.1994)(athletic association, as agent of state board of education, indirectly received federal funds and was therefore subject to Title IX). Conrail clearly "receives" federal funds under the FAHA, albeit indirectly, and is therefore liable under section 504.
 
 
 24
 Conrail denies, however, that it is liable under section 504 as an indirect recipient of federal funds. Conrail claims instead to be a mere incidental beneficiary of the funds, and therefore not liable under section 504. Conrail relies on United States Department of Transportation v. Paralyzed Veterans of America, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), in which the Supreme Court addressed the question of whether commercial airlines were liable under section 504 as "recipients" of the "Federal financial assistance" provided by federal statute to airports. The Supreme Court held that commercial airlines were not liable under section 504, because they were not recipients of the federal funds granted by statute to airports, but instead were mere incidental beneficiaries.[1] The Court held that section 504 "covers those who receive the aid, but does not extend as far as those who benefit from it." 477 U.S. at 607, 106 S.Ct. at 2712. The court refused to extend the scope of section 504 beyond those entities which actually received federal funds, because to encompass all entities which derived economic benefits from the expenditures "would give Sec. 504 almost limitless coverage." Id. at 608, 106 S.Ct. at 2712. In Paralyzed Veterans, the Supreme Court concluded that the airlines were not "recipients" of federal funds simply by virtue of the fact that they benefitted when airports received federal funds to build and improve runways.
 
 
 25
 Conrail argues that it is not a recipient of FAHA funds; instead, like the airlines, it merely derives an incidental benefit when the states use the funds to keep railroad crossings in good repair. Quoting Paralyzed Veterans, Conrail argues that the scope of section 504 cannot be defined by reference to "hypothetical collective concepts like commercial aviation or interstate highway transportation[.]" Id. at 611, 106 S.Ct. at 2714.
 
 
 26
 However, Conrail's reliance on Paralyzed Veterans is misplaced. In Paralyzed Veterans, the Supreme Court observed, "[I]t is clear that the airlines do not actually receive the aid; they only benefit from the airports' use of the aid." 477 U.S. at 607, 106 S.Ct. at 2712. Here, by contrast, not only does Conrail benefit from the State's use of the aid--it actually receives the aid, despite the indirect manner in which Conrail obtains the federal funds. Unlike the motoring public or the people who ride the rails, Conrail's "status ... goes beyond that of an indirect beneficiary of federal financial assistance" under the FAHA. Horner, 43 F.3d at 272 n. 5.
 
 
 27
 Moreover, the Supreme Court in Paralyzed Veterans specifically states that "Congress imposes the obligations of Sec. 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." 477 U.S. at 606, 106 S.Ct. at 2711. In Paralyzed Veterans, the only parties in a position to accept or reject the funds were the airport operators, not the airlines. Here, by contrast, Conrail is free to refuse federal funds and, instead, to use its own resources to pay for whatever improvements the State of Michigan requires it to make. In theory, Conrail could reject the State contracts, forcing the State to secure the services of another entity to make any improvements beyond those Conrail was under orders to make itself. In that hypothetical situation, Conrail's argument might have merit, because the benefits of the improved railroad crossings would arguably be thrust upon Conrail in much the same way the benefits of the improved runways were thrust upon the commercial airlines in Paralyzed Veterans. However, Conrail in fact opted to enter into contractual arrangements with the State of Michigan to receive federal funds for improvements to its crossings, and by doing so, Conrail subjects itself to the anti-discrimination provisions of section 504.
 
 B.
 
 28
 Not only does Conrail argue that it was not a "recipient" of federal funds, Conrail also argues that the federal funds it received did not constitute "Federal financial assistance." Conrail contends that the payment it received for services rendered pursuant to a contractual relationship amounted to compensation, not a subsidy. Therefore, Conrail argues, the funds cannot constitute "Federal financial assistance."
 
 
 29
 Conrail points out that it provides freight services, at fair market value, for the Department of Defense, but this arrangement does not render the railroad a recipient of "federal financial assistance." Conrail maintains that by the same token, it does not receive federal financial assistance when it contracts with the State to make railroad repairs and accepts federal funds to cover its actual costs and the fair market value of its services.
 
 
 30
 If Conrail were an independent contractor in the business of railroad repairs, with no preexisting obligation to maintain its own railroad crossings, this argument might have some merit. However, Conrail does not claim to offer its repair services generally, or to do repairs for other railroads. Conrail's argument ignores the important fact that when it received FAHA funds, it was paid to make repairs which it would otherwise have to make, sooner or later, using its own funds. Moreover, even if Conrail accepted federal funds to improve crossings which the state had not yet ordered it to repair, it was paid to improve its own property. It retained the benefits of the federally-funded improvements, which allowed it both to fulfill its continuing obligation to maintain safe railways generally, and also to stave off the obligation to use its own funds to make specific state-ordered repairs in the future. Despite Conrail's attempt to recharacterize its receipt of FAHA funds as compensation for services rendered, Conrail's receipt of those funds constituted a federal subsidy.
 
 
 31
 Conrail further argues that the language of the FAHA explicitly deems funds paid to railroads pursuant to the FAHA to be contractual and compensatory, and that the statute deems the reimbursement railroads receive under the FAHA to be of no benefit to the railroad. Conrail explains that Congress, recognizing the net benefit to railroads arising from the elimination of hazards at crossings, delegated to the Secretary of Transportation the authority to determine the extent of that benefit and to require railroads to pay that share of the project:
 
 
 32
 The Secretary may classify the various types of projects involved in the elimination of hazards of railway-highway crossings, and may set for each such classification a percentage of the costs of construction which shall be deemed to represent the net benefit to the railroad or railroads for the purpose of determining the railroad's share of the cost of construction. The percentage so determined shall in no case exceed 10 per centum....
 
 
 33
 23 U.S.C. Sec. 130(b). See also, 23 C.F.R. 646.210(b) (regulations promulgated by the Secretary of Transportation implementing section 130(b)).
 
 
 34
 Based on this provision of the FAHA, Conrail argues that any federal funds it receives must necessarily constitute reimbursement for actual costs and compensation for services rendered, rather than a subsidy, because the value of any benefit redounding to the railroad is expressly deducted from the money it is paid. Conrail's argument consists of three parts. First, Conrail asserts that, as a general matter, transferred funds which convey no net benefit to the recipient do not constitute subsidies. Second, Conrail claims that the FAHA funds are statutorily deemed to convey no net benefit to the railroad. Therefore, Conrail reasons, FAHA funds do not constitute a subsidy.
 
 
 35
 Conrail's syllogism depends on the assumption that the use of the term "deemed" in section 130(b) creates a conclusive presumption that the railroad receives no net benefit from FAHA funds, and that the funds therefore cannot constitute federal financial assistance. Conrail suggests this interpretation rests on the plain language of the FAHA. Conrail is correct that the language of the statute itself is conclusive where, as here, the terms of the statute are unambiguous. Burlington Northern R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859-60, 95 L.Ed.2d 404 (1987).
 
 
 36
 However, the plain language of the statute defeats Conrail's interpretation. It directs the Secretary to set a percentage of the costs of construction which is "deemed" to be the net benefit to the railroad "for the purposes of determining the railroad's share of the cost of construction"--not, as Conrail contends, for purposes of determining whether Conrail receives federal financial assistance.
 
 
 37
 Moreover, the statute expressly provides that the payment of costs of construction by the railroad must not exceed ten percent. Therefore, rather than precluding any inference that railroads were receiving any subsidy under the FAHA, as Conrail contends, the express language of the statute operates to ensure that railroads indeed receive a subsidy, to the extent the actual benefit to the railroads exceeds the statutory limit the railroads may be asked to contribute. In other words, the statutory sections and regulations on which Conrail relies operate to ensure that federal money will in fact be provided to cover the bulk of the cost of railroad safety improvements, irrespective of the actual benefit to the railroad. Therefore at the very least, beyond the cost percentages set by the statute and regulations, the federal funds dispersed under the FAHA constitute a subsidy.
 
 
 38
 For the foregoing reasons, we conclude that defendant Conrail was both a "recipient" of federal funds under the FAHA, and that the federal funds which Conrail received under the FAHA constitute "Federal financial assistance." Consequently, we affirm the district court's finding that Conrail is a recipient of "Federal financial assistance" within the meaning of section 504 and may be held liable under the Rehabilitation Act. We turn now to the merits of plaintiff's appeal.
 
 III.
 
 39
 The second issue raised on appeal and vigorously contested by the parties concerns the availability of punitive damages as a remedy for the implied cause of action under section 504.[2] After plaintiff Moreno received a jury verdict in his favor on his claim under section 504, the district court, upon Conrail's motion, struck the jury's punitive damages award. The court concluded that it could not imply a punitive damages remedy where Congress had given no indication that it intended to authorize such relief, and where punitive damages did not appear to give effect to the statutory objectives of section 504. Moreno contests this decision on appeal. Conrail maintains that the district court reached the correct result, and argues alternatively that even if punitive damages are sometimes available to a plaintiff under section 504, the district court's decision should nevertheless be affirmed in this case, because the evidence was insufficient to support an award of punitive damages, and, in any event, the award was excessive.
 
 
 40
 The question of whether punitive damages are ever available as a remedy to a plaintiff who has established intentional discrimination under section 504 presents a purely legal question of statutory interpretation, subject to de novo review. Although the availability of punitive damages to remedy an intentional violation of section 504 presents a question of first impression in this circuit,[3] the proper approach for addressing this question has been clearly established. The Supreme Court's decision in Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), sets forth the analysis for determining the remedies available pursuant to an implied cause of action under a federal statute. In Franklin, the Supreme Court addressed the question of whether monetary damages were available under Title IX, a statute which, like section 504, is enforceable through an implied right of action. Though the precise holding in Franklin concerned Title IX, the rule announced in that decision has general application to implied rights of action under any federal statute. The Court held:
 
 
 41
 The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.
 
 
 42
 503 U.S. at 70-71, 112 S.Ct. at 1035. The Supreme Court in Franklin made clear that the proper approach is to "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." Id. at 66, 112 S.Ct. at 1032. Therefore, to the extent the district court based its decision to strike punitive damages on a belief that such damages are unavailable unless Congress has explicitly authorized them, the district court was in error. The question remains, however, whether the district court's decision may nevertheless be supported under the Franklin approach.
 
 
 43
 In this circuit we adhere to Franklin by making a two-step inquiry. First, we determine whether Congress intended to limit the traditional presumption that all appropriate remedies are available under the statute. Then, if all appropriate remedies are in fact available, we determine whether the disputed remedy--here, punitive damages--is appropriate. See CSX Transportation, Inc. v. Marquar, 980 F.2d 359 (6th Cir.1992).
 
 A.
 
 44
 The first question before us is whether any evidence exists that Congress intended to limit the relief available to a plaintiff under section 504. The traditional tools of statutory construction are unavailing here, where the cause of action under section 504 has been implied by the courts rather than expressly created by Congress. Franklin, 503 U.S. at 71, 112 S.Ct. at 1035 ("[T]he usual recourse to statutory text and legislative history ... will not enlighten our analysis.") Instead, when confronted with Congressional silence on the issue of available remedies under a federal statute, we examine the state of the law in the years before and after the passage of the act in question to ascertain Congressional intent. See Franklin, 503 U.S. at 71, 112 S.Ct. at 1036 (evaluating "the state of the law when the Legislature passed Title IX" and examining "the years before and after Congress enacted this statute").
 
 
 45
 Using this method in Franklin, the Supreme Court examined the subsequent history of Title IX and determined that Congress did not intend to limit the remedies under that statute. The Franklin court pointed out that Congress acted twice to expand the protection available under Title IX, first with the passage of the Civil Rights Remedies Equalization Act of 1986, 42 U.S.C. Sec. 2000d-7, and subsequently with the passage of the Civil Rights Restoration Act of 1987, Pub.L. 100-259, 102 Stat. 28 (1988). In passing these acts, Congress made no attempt to limit the remedies already available under Title IX, though it was fully aware that the Supreme Court had previously endorsed the traditional presumption in favor of the availability of all appropriate remedies.
 
 
 46
 Based on these amendments and the common law context in which they were enacted, a majority of the Franklin court determined that Congress had not overturned the presumption in favor of the full range of appropriate remedies to redress a private cause of action under Title IX. Further, even the concurring Justices in Franklin acquiesced in the majority's conclusion that damages were available under Title IX, on the basis of these amendments. The concurring Justices disagreed with the majority's endorsement of a presumption in favor of "the full gamut of remedies" with respect to rights Congress "does not know it is creating." 503 U.S. at 77, 112 S.Ct. at 1039 (Scalia, J., concurring). Nevertheless, the concurring Justices agreed with the majority that the Civil Rights Remedies Equalization Act of 1986, 42 U.S.C. Sec. 2000d-7(a)(2) "must be read ... as an implicit acknowledgment that damages are available" under Title IX. Id. at 78, 112 S.Ct. at 1039.
 
 
 47
 We find the Franklin rationale controlling here. Both of the aforementioned Acts relied upon in Franklin likewise expanded the protection under section 504 of the Rehabilitation Act, without altering existing remedies, and with full knowledge of the traditional presumption in favor of the availability of all appropriate remedies. Because the Supreme Court found these two amendments sufficient to confirm the presumption in favor of all appropriate relief with respect to Title IX, we similarly find that these same Acts, which also amended section 504, are sufficient to confirm the presumption in favor of all appropriate relief under section 504. Indeed, we note that Congress enacted the 1986 amendment in response to a Supreme Court decision which limited actions under section 504, not Title IX. Therefore, the evidence of Congressional intent, which the Supreme Court majority and concurring Justices found sufficient under Title IX, is at least as persuasive with respect to section 504, if not more so.
 
 
 48
 Moreover, in the Civil Rights Act of 1991, 42 U.S.C. Sec. 1981a, Congress placed caps on damages for causes of action brought pursuant to section 501, but not section 504, of the Rehabilitation Act of 1973; pursuant to Title I of the Americans with Disabilities Act; and pursuant to Title VII. However, the Civil Rights Act of 1991 makes no mention of causes of action brought under section 504. In short, Congress has never acted to limit the remedies available to a plaintiff under section 504, even though it has carefully crafted various amendments to other parts of the entire package of civil rights legislation, and even though it has been fully aware, all the while, that absent its express indication to the contrary, the traditional presumption in favor of the availability of all appropriate remedies would apply. Under Franklin, Congress' silence on the issue of the availability of remedies under section 504--and under Title VI of the Civil Rights Act of 1964, from which section 504 derives its remedies--compels the conclusion that the traditional presumption in favor of all appropriate relief applies. See Marquar, 980 F.2d at 364 n. 9 (" Franklin makes clear that silence is not enough to preclude a remedy under an implied cause of action. Instead, Congress must expressly state that damages are not permitted.")
 
 B.
 
 49
 Presuming that all appropriate remedies are available, we must next decide whether punitive damages are an "appropriate" remedy where the plaintiff has established an intentional violation of section 504. In addressing the question of the propriety of punitive damages as a remedy for violations of section 504, we are guided by this court's decision in CSX Transportation, Inc. v. Marquar, 980 F.2d 359 (6th Cir.1992). In Marquar, the question was whether monetary damages were recoverable in a suit brought under the Railway Labor Act ("RLA"), 45 U.S.C. Sec. 151 et seq. This court determined that Congress had not limited the remedies available under the RLA. Even so, Marquar held that a railroad suing a union for an illegal strike under the RLA could not recover money damages. The majority reasoned that "[i]n the volatile atmosphere of labor-management relations, the threat of a damages action could upset the balance intended by the RLA." Marquar, 980 F.2d at 382. Accordingly, the majority concluded monetary damages were not an "appropriate" remedy, and disallowed them.
 
 
 50
 The Marquar decision thus demonstrates the type of countervailing considerations which may render otherwise available remedies inappropriate. We find no such countervailing considerations weighing against the propriety of punitive damages in a section 504 action for intentional discrimination. To the contrary, considerations here weigh in favor of punitive damages. For the following reasons, we hold punitive damages are an appropriate remedy for intentional violations of section 504.
 
 
 51
 First, section 504 is a civil rights statute, and as such, should be broadly construed. Cf. Owen v. City of Independence, Missouri, 445 U.S. 622, 635-36, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980) ("This Act [section 1983] is remedial, and in aid of the preservation of human liberty and human rights.... [S]uch statutes are liberally and beneficently construed.") (quoting Representative Shellabarger's comments on section 1983 at the time of its enactment); Moyo v. Gomez, 40 F.3d 982, 985 (9th Cir.1994)("[I]t has been long established that Title VII, as remedial legislation, is construed broadly."), cert. denied, California Dept. of Corrections v. Moyo, --- U.S. ----, 115 S.Ct. 732, 130 L.Ed.2d 635 (1995); and In re Perry, 882 F.2d 534, 544 (1st Cir.1989) ("Civil rights statutes like 42 U.S.C. Secs. 1983, 1988 are to be construed generously to effectuate their salutary purposes."). Conrail argues that as a civil rights statute, section 504 serves a remedial purpose, not a punitive one, and that damages under the Act should therefore be limited to those which make the plaintiff whole. Accepting this argument, the district court concluded punitive damages do not give effect to the statutory objectives of section 504.
 
 
 52
 However, the clear purpose of section 504 of the Rehabilitation Act of 1973 is to eliminate discrimination against otherwise qualified disabled individuals in the terms or conditions of their employment. See Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 632, 104 S.Ct. 1248, 1253, 79 L.Ed.2d 568 (1984) (describing "enhancing employment of the handicapped" as "the focus" of section 504). This remedial purpose may be served not only when section 504 defendants are compelled to compensate disabled individuals whom they have intentionally wronged in the past, but also when such defendants are deterred, by the imposition of punitive damages, from discriminating against disabled persons in the future. It is well-established that punitive damages awards serve not only to punish, but also to deter. Smith v. Wade, 461 U.S. 30, 49, 54-55, 103 S.Ct. 1625, 1636, 1639-40, 75 L.Ed.2d 632 (1983).
 
 
 53
 Moreover, the Civil Rights Act of 1991, 42 U.S.C. Sec. 1981a, allows recovery of punitive damages, albeit with a monetary cap, under the following statutes: Title VII of the Civil Rights Act of 1964; Section 501 (but not section 504) of the Rehabilitation Act of 1973; and Title I of the Americans With Disabilities Act. While we recognize the disparities between these statutory sections and section 504, nevertheless we find that Congressional approval of punitive damages in the context of Title VII and related statutes demonstrates that punitive damages can be an appropriate remedy for civil rights violations. Therefore, unlike the RLA--a statute carefully designed to strike a balance of power--section 504, as a civil rights statute, should be construed to provide a broad range of remedies to an injured plaintiff.
 
 
 54
 Another consideration which weighs in favor of punitive damages for intentional violations of section 504 is the tort-like nature of the cause of action arising under section 504. An action under section 504 "is essentially a form of statutory tort.... 'Rehabilitation Act claims are injuries to individuals and analogous to personal injury claims.' " Pandazides v. Virginia Bd. of Ed., 13 F.3d 823, 829 (4th Cir.1994)(quoting Wolsky v. Medical College of Hampton Roads, 1 F.3d 222, 224 (4th Cir.1993)).
 
 
 55
 The Supreme Court has observed that "one of the hallmarks of traditional tort liability is the availability of a broad range of damages ... [which] in many cases are larger than the amount necessary to reimburse actual monetary loss sustained or even anticipated by the plaintiff, and thus redress intangible elements of injury that are 'deemed important, even though not pecuniary in [their] immediate consequence[s].' " United States v. Burke, 504 U.S. 229, 235, 112 S.Ct. 1867, 1871, 119 L.Ed.2d 34 (1992) (quoting D. Dobbs, Law of Remedies 136 (1973)). Again, the Supreme Court has observed that " 'punitive damages have long been a part of traditional state tort law' " and that in the decisions of the Supreme Court itself, "the concept of 'punitive damages' has a long pedigree in the law." Molzof v. United States, 502 U.S. 301, 306, 112 S.Ct. 711, 715, 116 L.Ed.2d 731 (1992) (quoting Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984)). In particular, "punitive or exemplary damages are generally available in those instances where the defendant's misconduct was intentional or reckless." Burke, 504 U.S. at 237, 112 S.Ct. at 1872. Given the longstanding acceptance of punitive damages in tort actions, and the resemblance of section 504 to such an action, we find punitive damages to be an appropriate remedy for intentional violations of section 504.
 
 
 56
 In concluding punitive damages are an appropriate remedy for intentional violations under section 504, we acknowledge that plaintiff Moreno has brought only one published post- Franklin, district court case to our attention in which the court explicitly held that punitive damages were available. See Kedra v. Nazareth Hospital, 868 F.Supp. 733 (E.D.Pa.1994). We also acknowledge that defendant Conrail has cited several pre- Franklin district court decisions concluding that punitive damages are unavailable to a section 504 plaintiff. See, e.g., Cortes v. Board of Governors, 766 F.Supp. 623 (N.D.Ill.1991); Glanz v. Vernick, 750 F.Supp. 39, 45 (D.Mass.1990). Further, we recognize that the Marquar majority, concluding monetary damages were inappropriate under the RLA, observed:
 
 
 57
 In the 66-year history of the RLA, no federal court has published an opinion holding that a union may recover damages from a railroad or that a railroad may recover damages from a union.
 
 
 58
 * * *
 
 
 59
 Congress intended for the courts to set up a "common law" for the appropriate enforcement of the RLA. We conclude that the common law that has emerged does not contemplate awards of damages between union and railroads.
 
 
 60
 980 F.2d at 380. In light of this language from Marquar and several district court cases referred to above, we must decide whether a "common law" has emerged under section 504 of the Rehabilitation Act which "does not contemplate awards of [punitive] damages." We reject that proposition.
 
 
 61
 In Marquar, we specifically acknowledged that under the RLA, we were not presented with "the usual case" where the legislative history was silent respecting Congressional intent to limit the traditional presumption in favor of a full range of remedies. 980 F.2d at 365. We observed that "[i]nstead, the RLA presents a case in which the legislative history speaks directly to Congress's intent that this statute create rights for which the courts would fashion a whole spectrum of remedies." Id. Courts which have fashioned remedies under the RLA, therefore, have done so with a clear understanding that the full range of remedies was available. Accordingly, the Marquar court was able to look with confidence to the common law which had emerged under the RLA--not to determine whether monetary damages were available, but to determine whether they were appropriate.
 
 
 62
 By contrast, "[b]efore Gwinnett some courts interpreting the Rehabilitation Act ... required plaintiffs to demonstrate that Congress intended monetary damages" and these courts "found that there 'is scant evidence of a legislative intent to authorize all sorts of monetary damages in discrimination cases.' " Justice v. Pendleton Place Apts., 40 F.3d 139, 142 (6th Cir.1994) (citation omitted). This court has already observed that those pre- Franklin v. Gwinnett courts "were asking the wrong question," because they focused on whether Congress affirmatively provided for specific remedies under section 504. Id. at 142-43. Franklin confirms that the focus should instead be on whether Congress affirmatively acted to alter the traditional presumption in favor of the full range of remedies. The pre- Franklin cases thus have limited applicability. Id.
 
 
 63
 However, the post- Franklin case law supports our conclusion that punitive damages are appropriate to remedy intentional violations of section 504. We have already mentioned one district court case which has squarely faced the question, and ruled punitive damages are appropriate. Kedra v. Nazareth Hospital, 868 F.Supp. 733 (E.D.Pa.1994). We also find Reich v. Cambridgeport Air Systems, 26 F.3d 1187 (1st Cir.1994), provides analogous support. In Reich, the First Circuit relied on the sweeping language of Franklin to conclude punitive damages were an available remedy for retaliatory discharge under the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. Sec. 660(c). The First Circuit observed that "given the expansive language in Franklin ... it is difficult to exclude even exemplary damages where otherwise justified in particular circumstances." Reich, 26 F.3d at 1191. The First Circuit concluded exemplary damages were "otherwise justified" to remedy the OSHA violation in Reich, because they were expressly authorized by Congress in analogous "whistleblower" statutes, and because the OSHA violation complained of resembled a tort action, for which punitive damages are traditionally available. Id. at 1191-92.
 
 
 64
 We also draw support for our conclusion from the Fourth Circuit's decision in Pandazides v. Virginia Bd. of Ed., 13 F.3d 823 (4th Cir.1994). In Pandazides, the Fourth Circuit relied on Franklin to hold that a jury trial is constitutionally mandated under section 504, because the "full panoply" of legal remedies is available to a section 504 plaintiff in a disparate treatment case. 13 F.3d at 830, 832. Defendant Conrail contends the Pandazides decision is inapposite, because it did not expressly rule on the question of punitive damages. However, prior to the Supreme Court's decision in Franklin, the Fourth Circuit had determined that neither punitive damages, nor compensatory damages in the form of pain and suffering, were available under section 504. Eastman v. Virginia Polytechnic Inst. & State Univ., 939 F.2d 204 (4th Cir.1991). Without distinguishing between compensatory and punitive damages, the Fourth Circuit in Pandazides stated that in light of the Franklin decision, " Eastman can no longer be considered good law." 13 F.3d at 830.
 
 
 65
 Conrail also attempts to distinguish Pandazides by pointing to footnote 9 of that opinion, which states in part, "Not having the question before us, we express no opinion on the issue of the standards necessary to recover punitive, as opposed to compensatory, damages under Sec. 504...." Pandazides, 13 F.3d at 830. Conrail argues, based on this statement, that the Fourth Circuit was leaving open the question of the availability of punitive damages. However, as we interpret this statement, the Fourth Circuit was assuming the availability of punitive damages, but leaving open the question of the standards a plaintiff must meet in order to recover them. This footnote, together with the court's unqualified rejection of its decision in Eastman, suggest that the Fourth Circuit supports the award of punitive damages under section 504.
 
 
 66
 We remain convinced that we cannot rely on the case law issued prior to the Supreme Court's decision in Franklin to determine the propriety of punitive damages under section 504. Instead, we find support for our conclusion in the post- Franklin decisions. In any event, section 504's purpose as a civil rights statute, as well as its tort-like nature, suggest that punitive damages are appropriate, and we find no countervailing public policy considerations here as in Marquar. In sum, having first found the full range of appropriate remedies available, we conclude punitive damages are an appropriate remedy for an intentional violation of section 504.
 
 IV.
 
 67
 Finally, we address whether the district court's decision to strike the jury's punitive damages award should nevertheless be affirmed in this case, notwithstanding the availability and propriety of punitive damages as a general rule. Conrail contends the evidence was insufficient as a matter of law to permit a reasonable jury to conclude Conrail acted with malice or reckless disregard for Moreno's rights, so as to warrant the imposition of punitive damages. Conrail asserts that the district court should have granted defendant's motion for judgment as a matter of law on this issue at trial. Conrail further contends the jury's punitive damages award, totalling $1,312,752, was excessive. We take up both of these arguments in turn.
 
 A.
 
 68
 The standard for granting a motion for judgment as a matter of law is clear:
 
 
 69
 [T]he evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.
 
 
 70
 Cline v. United States, 997 F.2d 191, 196 (6th Cir.1993) (quoting Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979)). On appeal the Court of Appeals applies this same standard. Id.
 
 
 71
 Upon stipulation of the parties, the district court instructed the jury in relevant part as follows, using a standard instruction for imposing punitive damages in other civil rights actions:
 
 
 72
 If you find that the Defendant intentionally discriminated against Plaintiff, the law allows you but does not require that you award punitive damages. The purpose of an award of punitive damages is, first, to punish a wrongdoer for misconduct and, second, to warn others against doing the same. In this case, you may award punitive damages if you find that the Defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the right of Plaintiff to be free from such intentional discrimination.
 
 
 73
 If you determine from the evidence received in this case that the Defendant's conduct justifies an award of punitive damages, you may award an amount of punitive damages which all the jurors agree is proper. In fixing the amount of punitive damages, you should consider the following questions: How offensive was the conduct; What amount is needed, considering the Defendant's financial condition, to prevent repetition; Does the amount have a reasonable relationship to the actual damages awarded.
 
 
 74
 The district court further instructed the jury that they should "fix the amount using calm discretion and sound reason" if they chose to award punitive damages, and that they "must not be influenced by sympathy for or dislike of any party."
 
 
 75
 Conrail claims the evidence introduced at trial was insufficient to support the giving of this instruction. Conrail points out that "[t]he imposition of punitive damages in civil rights actions has generally been limited to cases involving egregious conduct or a showing of willfulness or malice on the part of the defendant." Beauford v. Sisters of Mercy-Province of Detroit, 816 F.2d 1104, 1109 (6th Cir.), cert. denied, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 217 (1987). The issue before this court is whether, viewing all the evidence in Moreno's favor, no reasonable jury could find that Conrail acted with malice or reckless indifference to Moreno's right to be free from intentional discrimination. In making this determination, we do not sit as a seventh juror. It is not our role to substitute our judgment for that of the jury. Even if this court would have drawn a different conclusion from the evidence, our only inquiry here is whether a reasonable jury could have found in Moreno's favor. Douglass v. Eaton Corp., 956 F.2d 1339, 1343 (6th Cir.1992) (explaining that "[i]t is not enough that the district [or appellate] court disagrees with the verdict" to support judgment notwithstanding the verdict). If we answer that question in the affirmative, the jury verdict must stand.
 
 
 76
 Applying these standards, we conclude the evidence was sufficient to permit a reasonable jury to impose an award of punitive damages. Moreno testified that during his thirty-six years of service to Conrail, he was an exemplary employee, and that his diabetic condition--of which he himself was unaware until 1977--never once interfered with his job performance during that time. During the thirteen years between the time he became aware of his diabetic condition and the time he was disqualified from his supervisory position at Conrail, Moreno controlled his condition with oral medication. He further testified that he always carried a tube of glucose and a roll of Lifesavers in his pocket.
 
 
 77
 In the fall of 1991 Moreno underwent surgery on two separate occasions, first for carpal tunnel syndrome and then for carotid artery blockage. Moreno returned to work after both operations without incident, and forwarded his medical records to Orest Hawryluk, M.D., Conrail's Medical Director. Moreno testified that he was never asked to report this condition, so Conrail first learned of his diabetic condition from these records. Dr. Hawryluk testified that Conrail has a policy regarding restrictions that must be imposed on diabetics, including a requirement to avoid working irregular shifts and to avoid irregular meal breaks.
 
 
 78
 On December 19, 1991, using a company medical report called an "MD-40," Dr. Hawryluk placed the foregoing restrictions, among others, on Moreno. That same day, Moreno received a memo from his general car foreman, describing the restrictions. Moreno returned to work as usual on December 20th, a Friday. The following Monday, the 23rd, Moreno started a week's Christmas holiday vacation. He planned to return to work December 30th. On Christmas Eve, Moreno received a letter by registered mail, dated December 23 and signed by the trainmaster general foreman, which stated simply, "Due to the restrictions on the MD-40 dated December 19, 1991, you are not qualified to perform your duties as a supervisor." Although the record is not totally clear on this point, the parties appear to agree that this communication was the effective equivalent of termination. Moreno received no phone calls or other correspondence from Conrail in connection with the disqualification letter.
 
 
 79
 Kenneth Carter, Moreno's supervisor, testified that he gave the instruction that Moreno should be disqualified. Carter testified that the restrictions in the MD-40 constituted the sole basis for his decision to disqualify Moreno, and that his major concern was the restriction to avoid irregular meal breaks. Carter was asked at trial if he was afraid there would be an emergency situation where Moreno did not have time to eat, or forgot to eat, and Carter confirmed that this was his concern. He testified that if that restriction had not been imposed, he would not have disqualified Moreno.
 
 
 80
 Carter conceded at trial that he was not a medical expert; however, he testified that he was concerned by the meal break restriction placed on Moreno because he knew a lot of people who were diabetics, but had never known any of them to have a restriction to eat at the precise times. He further testified that his wife was a diabetic who worked for Conrail without restrictions, perhaps because Conrail was unaware of her condition. Carter conceded his wife has to eat at regular intervals, but not on the precise schedule he was led to believe Moreno required.
 
 
 81
 Subsequent to his disqualification, Moreno obtained letters from his cardiologist, vascular surgeon and endocrinologist, all of whom had been treating his diabetic condition, and all of whom stated that Moreno was able to work without restriction. In light of these letters, Dr. Hawryluk--who admitted at trial that he never personally examined Moreno--modified Moreno's restrictions on December 30, 1991. Dr. Hawryluk claimed no specialty in endocrinology. He testified he had treated only a total of ten to fifteen diabetics in his entire career, all prior to 1967. However, he retained Moreno's restriction to avoid irregular shifts and meal breaks in the modified MD-40. In a letter to Conrail's labor relations office, he wrote: "Current standards of medical care dictate that restrictions issued to Mr. Moreno remain in place. I have not seen any medical documentation that would justify a change."
 
 
 82
 At trial Dr. Hawryluk was asked if Moreno would violate the restriction if he were required to work three to four hours past his regular shift on an overtime basis. Dr. Hawryluk testified that the restriction would not be violated under those conditions, provided Moreno ate during his regular shift.
 
 
 83
 Moreno also introduced evidence regarding Conrail's labor agreement. First, Moreno introduced evidence that the labor agreement made available a procedure by which a board of doctors could be convened to determine an employee's physical fitness, before an employee is permanently removed from his position. Artt Cantrell, Conrail's Senior Labor Relations Specialist, confirmed that the union had requested such a board of doctors on Moreno's behalf, but that the railroad had denied the request. Moreno also introduced evidence that the labor agreement required Conrail to furnish alternate supervisory employment to foremen who, after long and faithful service, become physically unable to continue in their positions. Cantrell testified that he had identified some twenty positions suitable for Moreno, but that it was not his position or obligation to offer any of them to Moreno.
 
 
 84
 Conrail contends that no reasonable jury, based on the foregoing evidence, could find Conrail acted with actual malice or reckless indifference to Moreno's right to be free from intentional discrimination. Conrail contends that Moreno's exemplary work record is inapposite, because Conrail never put Moreno's performance in issue; that the Christmas Eve arrival of Moreno's disqualification was justified, without regard to business judgment, due to Conrail's prompt response to the medical report of December 19, 1991; and that Moreno, not Conrail, failed to fulfill obligations under the labor agreement.
 
 
 85
 At most, these constitute legitimate jury arguments. This court must make all reasonable inferences in Moreno's favor. So doing, we conclude that a reasonable jury could have found Conrail acted with actual malice or reckless disregard. Without presuming to identify the actual reasons the jury imposed punitive damages on Conrail, we note that a reasonable jury could have determined that to send a disqualification letter to an employee on December 23, by registered mail, evinced malicious intent--particularly where the employee was not due to return to work until after the holidays, and could not pose any imminent safety concerns until that time. A reasonable jury also could have inferred malice from the disparity between Conrail's treatment of Carter's diabetic wife and its treatment of Moreno.
 
 
 86
 In addition, on the evidence presented, a reasonable jury could have found that Conrail took so little care in assessing the actual condition of this loyal 35-year employee, made so little effort to accommodate his disability, and so poorly articulated a basis for its safety concerns, that Conrail acted with reckless disregard for Moreno's rights. A reasonable jury further could have found, viewing the evidence in Moreno's favor, that Conrail violated its labor agreement--which in turn bolsters a conclusion that Conrail acted with callous disregard for plaintiff's right to be free from discrimination.
 
 
 87
 Even if the foregoing evidence were not enough to support an award of punitive damages--and we conclude it is--we emphasize one final piece of evidence. At trial Moreno admitted into evidence a letter written by Conrail's Medical Director to Conrail's Labor Relations office, approximately two weeks after Moreno's removal. The final portion of the letter reads:
 
 
 88
 I would like to point out that current laws require reasonable accommodation for handicapped employees. If we are unable to prove bona fide attempts at accommodation, the company is risking unnecessary litigation and heavy fines.
 
 
 89
 Drawing all inferences in Moreno's favor, a jury could reasonably conclude, from this warning, that Conrail intentionally ignored the advice of its own medical director and continued its refusal to reinstate Moreno with reckless disregard for his right not to be discriminated against on the basis of his disability.
 
 
 90
 In sum, because we conclude the evidence was sufficient to give the punitive damages instruction to the jury, we reject this proposed basis for upholding the district court's decision to strike the punitive damages award.
 
 B.
 
 91
 Conrail alternatively contends that the jury's punitive damages award was excessive. The jury awarded punitive damages to Moreno in the amount of $1,312,752--an amount seven times the combined awards for wage and benefit loss, and for pain-and-suffering and emotional distress. Conrail points out that the district court never made an initial determination as to whether the award was excessive, because it made the decision to strike the award on other grounds. Conrail asserts that a determination as to the size of a punitive damages award requires a close scrutiny of the evidence, which the trial court is better positioned to do in the first instance. For this reason Conrail requests remand to the district court on this issue.
 
 
 92
 In Honda Motor Co., Ltd. v. Oberg, --- U.S. ----, ----, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336 (1994), the Supreme Court recently noted that "[j]udicial review of the size of punitive damage awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." In TXO Production Corp. v. Alliance Resources Corp., --- U.S. ----, ----, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993), the Supreme Court stated that a jury's punitive damages award is entitled to "a strong presumption of validity" when that award is the product of a process which includes "review ... by the trial judge who also heard the testimony." Finally, in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 20, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991), the Supreme Court found no procedural due process violation inherent in the common law method of assessing punitive damages, where that method included both "meaningful and adequate review by the trial court" and subsequent appellate review.
 
 
 93
 In view of this current, clear Supreme Court precedent, we agree that the district court should review the size of the punitive damages award in the first instance. The district judge heard all the witnesses, including of course the plaintiff. Initially at least, he is in the best position to assess whether, under appropriate and well-established rules, the punitive damage award was or was not excessive. Without expressing any opinion as to the size of the award, we remand this issue to the district court for proceedings in accordance with Fed.R.Civ.P. 59. See 11 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Sec. 2807 (1973).V.
 
 
 94
 In sum, we AFFIRM the district court's decision that defendant Conrail was a recipient of federal financial assistance within the meaning of section 504 of the Rehabilitation Act. However, we REVERSE the district court's decision to strike the jury's award of punitive damages. We hold that punitive damages are available to a plaintiff who establishes intentional discrimination under section 504. We further find that the evidence was sufficient to submit that issue to the jury. Finally, we REMAND to the district court for a determination whether the jury's punitive damages award was or was not excessive and for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Douglas W. Hillman, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 We note that Congress subsequently passed legislation that effectively overruled the result in Paralyzed Veterans by amending the Federal Aviation Act, the statute at issue in that case, to prohibit discrimination by airlines. See Air Carrier Access Act of 1986, P.L. 99-435, 100 Stat. 1080 (1986). However, we conclude this amendment does not affect our analysis here
 
 
 [2]
 Section 504 does not expressly create a private remedy for individuals with disabilities who have been subjected to discrimination. However, this court and other circuits have implied a private right of action under section 504. Jennings v. Alexander, 715 F.2d 1036 (6th Cir.1983), rev'd on other grounds, Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Cf. Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 630 n. 7, 104 S.Ct. 1248, 1252 n. 7, 79 L.Ed.2d 568 (1984) (permitting a private party to recover back pay in a suit under section 504, without directly deciding the availability of a private right of action under section 504), superseded by statute on other grounds by Civil Rights Restoration Act of 1987, P.L. 100-259, 102 Stat. 28 (1988). See also, 3A Larson, Employment Discrimination Sec. 106.34 n. 36 (collecting circuit court cases unanimously recognizing private right of action under section 504)
 
 
 [3]
 The question of whether the disability discrimination provisions of the Rehabilitation Act permit recovery of damages was certified to this court on appeal in Justice v. Pendleton Place Apts., 40 F.3d 139 (6th Cir.1994). That opinion provides some guidance on the issue before us now. In Justice, however, we concluded the appeal sought an advisory opinion. Finding that the district court erred by certifying its order as a final and appealable order under Fed.R.Civ.P. 54(b), we vacated the Rule 54(b) certification and dismissed the appeal. The Justice opinion, therefore, "ma[de] no effort to decide the issue" of damages under section 504. 40 F.3d at 142